States v. I think it's Olson-Joseph. We'll find out. It's either Olson-Joseph or Joseph-Olson. 23-11857. This is Budrani. Am I pronouncing that correctly? Yes, you are. Thank you. All right. So before the clock begins, inquiring minds want to know. It is Olson-Joseph. Olson-Joseph. That's what I thought. His name. We tried to have it corrected below, but unfortunately the docket still reads Joseph Olson. Good morning and may it please the court. Anshu Budrani, Assistant Federal Public Defender on behalf of Olson-Joseph. Law enforcement officers here seized and forcibly disarmed Mr. Joseph without any individualized reasonable suspicion that he was committing a crime. Based on that alone, this court must reverse the denial of his motion to suppress. Florida in 2015 amended its concealed carry statute, codifying concealed carry as presumptively lawful behavior in Florida. Since then, the Florida District Courts of Appeal have all consistently held that law enforcement officers may not see someone merely for carrying a concealed firearm. Here, after observing Mr. Joseph engage in solely lawful conduct for nearly an hour, detectives stopped him because they observed what they believed to be a gun in his front pocket. Specifically, they said… You don't dispute, I assume, that there might be other circumstances in which the possession of a concealed weapon alone could give rise to reasonable suspicion. Say, for instance, he's in a school zone. I think then we're talking about a different… Different. I think there's different statutes that apply to carrying in different areas, like in a school, in airports, sometimes in hospitals. Yeah, right. It's just the planned concealed carry statute. The change made in 2015 was very specific, and I think we learned from the third DCA opinion that issued last year that perhaps the change in the statute was in response to Florida DCA courts sort of holding differently as to, like, when someone can be stopped when seen with a firearm. Can I ask you a question, though? Because my understanding… So, I'm trying to test the limits of, you know, the position you're taking. Under Florida statute, the way I understand it, you… An officer can ask you, do you have your license for a concealed weapon permit, correct? Correct. So, I guess my question is, could they have stopped him and asked him for… Did he have his permit on him? They absolutely could have had a consensual encounter with him to ask him whatever questions they wanted to, but in this case, that's not what happened. No, I understand that. I'm just trying to… Because, obviously, remember, we're going to have to write an opinion, so I'm just trying to figure out exactly what the limits are of your argument. I think also Carter v. State, which is the second DCA case, actually has that fact pattern in there. An individual was observed walking in an apartment complex in a high-crime area that was actively under police surveillance. Officers saw a firearm holster under this individual's shirt. They followed him and asked him, do you have a permit for that gun? And he chose not to respond and continue on his way. Didn't change his behavior, didn't start running, sort of continued on in, like, the normal course, and they then seized him. And the second DCA, in that opinion, said all officers affirmatively observed him doing was carrying a concealed carry. No, in this case, obviously, they just testified that all they saw was the gun, and that was sufficient for them to, under their testimony, to stop him. But the question is, you're not taking the position that you can never stop someone if they see this. So, like, if you're the neighborhood cop and you know that this person is a convicted felon and you see that they have a gun, you can stop him and ask them, do you have a concealed permit for this? Yes, and if you know someone, if you know their name, you can run their name. There's nothing stopping cops from investigating if they see something like a firearm that they believe poses some sort of danger. But the firearm alone, when otherwise observing normal behavior. Right, and that's all they testified here was that they just saw the gun and that was it. Yes, and the Florida courts of appeals, at least, are in unison on post-2015, merely seeing a firearm, even in a high-crime neighborhood, even if someone's handling the gun. I think the third DCA case, the individual scene, moved the gun from his waistband to his backpack. That was viewed as not being sufficient to create any sort of reasonable suspicion of any sort of crime. And I think the factors that the government's relying on here, in terms of the totality of the circumstances, don't really shift the needle in the direction of reasonable suspicion because they're all factors about the environment and are not individualized to the individual that they're observing. And so from what the cops saw here for 45 minutes, they observed Mr. Olson getting a haircut, walking into a house and then walking out of a house. They did not observe him engaging in any sort of unlawful conduct or anything that was even suspicious. And then he just started walking down the street and that's when they chose to stop him. And so in a case like this, on these facts and on this record, where it's very clear that the reason he was stopped was solely for being in possession of a firearm, that doesn't meet the Fourth Amendment and it doesn't form – there's no reasonable suspicion that can be drawn. I'm going to ask you this question. I think, speaking only for myself, that you have wisely focused your argument on the reasonable suspicion of what we're now calling a stop and that you have not pressed too hard this morning anyway the idea that this is an arrest. And I guess I want to give you the opportunity to respond to the reason that I am suspicious of the arrest argument is that it seems to me that the only – that at the time the gun was seized, this hadn't sort of ripened yet into a full arrest. And most of the stuff you cite for the proposition that this was an arrest sort of post-dates or post-times, so to speak, the seizure of the gun, the wallet, the headphones, all this stuff that deluded attention. I can tell that you don't want to die in the ditch if this was an arrest, but do you want to respond to my own suspicion about your argument that this was an arrest? Sure. So a lot of the cases I think there was – and it's at Acosta, which is the case where the test comes from about whether something turns into a de facto arrest. There's like at least some sort of acknowledgement that perhaps there was reasonable suspicion to initiate a stop and then as it goes on, maybe it's more than it needs to be to fit within the bounds of reasonable – of a Terry stop. So then it sort of turns into an arrest. The way I viewed what occurred here was that it was seeming to be an arrest at its inception, and everything sort of happened – it cascaded and all sort of happened within a very short period of time sort of all at once. They approach him at gunpoint, immediately remove the firearm, almost immediately then remove the phone in a second frisk, cuff him almost immediately after that and then move him to behind their police vehicle where they then search him again. It sort of is all happening at the same time, which is why I believe it's distinguishable from a lot of the cases. It just – their initial approach just – it didn't – it wasn't a Terry stop. But you agree though if it was an arrest, they obviously have under case law the right to seize the firearm for officer safety if they're doing an arrest. If they have probable cause, yes. Now I understand you have to get to the probable cause, but if you're doing an arrest and you had the probable cause, they had the right to do – remove the weapon from the defendant. But that was the gist of the argument. When I watched the video and I saw what happened, to me it was more than a Terry stop. Even at the time – do you agree – maybe I'm wrong about this, but do you agree with my premise that we need to sort of measure the stopness or arrestness of this thing at the time the gun is taken? I don't think that is what the cases stand for. I reread Acosta prior to coming here, and I think what I received from the case – because there was sort of a line of demarcation between we think this initial seizure was okay, but then we think that everything after that wasn't, and so there was a natural demarcation line and something had been seized prior. I think with determining whether it's a de facto arrest, it is more akin to like a totality of the circumstances type of analysis where you have to sort of look at these four non-exclusive factors and sort of consider exactly what happened in the entirety of the encounter between the police and the individual, because if you find it to be a de facto arrest, then anything that comes from it is suppressible. And that's true even if the thing you're seeking to suppress is just the gun? I think so. Here it was – initially we moved to suppress the gun plus statements, and the district court did suppress the statements but did not suppress the gun. But that is my read. But as you've noted, we believe there was not even reasonable suspicion, let alone probable cause here. And so on that basis alone, because of the complete lack of individualized suspicion asked for Mr. Joseph himself, the officers did not have the authority to stop him and then seize his firearm on that basis alone. All right, very well. You'll have five minutes of rebuttal time. Ms. Roberts, let's hear from you. May it please the court, Tori Roberts on behalf of the United States. I'd like to discuss two topics today. First, the reasonable suspicion, and then second, picking up with Judge Newsom's questioning about whether the fact that even if the stop had later morphed into an arrest, whether that would result in the suppression of the firearm if the stop was lawful at the time the firearm was seized. So beginning with reasonable suspicion, the officers had reasonable suspicion here under the totality of the circumstances. The officers had spent at least about 45 minutes observing and conducting surveillance on a particular residence within a high-crime area because they had received a report about narcotic sales at that residence and because there was an unsolved homicide that had occurred at that residence approximately 10 days before. And I think those contextual factors distinguish this case from some of the other Florida intermediate appellate court cases that Mr. Joseph's counsel has referenced regarding whether simply possessing a firearm in a high-crime area is sufficient for a stop. But what particularized facts gave rise to reasonable suspicion with respect to Mr. Joseph himself? I think the particularized fact was that he was possessing the firearm, but then it was also that he was spending time at that residence. And so it's that the factors around his possession— They were surveilling—go ahead. But what does that have to do with reasonable suspicion as to Mr. Joseph? Because, I mean, unless they had evidence or they had information that someone who matched Mr. Joseph's description was the person involved in the homicide, what would be the basis for stopping him just for possession of a weapon? So the officers also testified about the connection between narcotic sales and firearm possession and that in their experience, individuals often carry a firearm to protect them. During surveillance, did they ever see any hand-to-hand transaction involving the defendant in this case? They did not. So they did not see any— What distinguishes Mr. Joseph from just any law-abiding citizen who happens to be in that area? The fact that he spent a significant amount of time at this particular residence. As this court has said in Hunter, an individual's proximity to illegal activity is a factor that can be considered under the totality of the circumstances. But Hunter's way different, right? Hunter, a lot more tying that defendant to the bad stuff going on in the house than getting a haircut in the front yard. So in Hunter, the individual was observed—was seen observing illegal gambling. So I understand that that fact pattern is different. But I think the principle still applies, that the fact that here Mr. Joseph had been associating with this house that the officers had reason to suspect was connected to narcotic sales. And then they saw him carrying a firearm and they know that this specific area— I also want to talk a bit about the area generally. This wasn't a very, you know, a wide swath of the city that they said was a high-crime area. But the issue is that once the state of Florida has made the decision to now allow for the residents, citizens of the state of Florida to possess and carry concealed weapons, you're going to have to have more than just, you know, a hunch. I understand that concern. And I just do want to come back to the low bar for reasonable suspicion. I think that it is more than a hunch. It's a low bar, but you still have to meet the bar. I understand. And I think here that the officers—the objective facts that we're looking at here in terms of the information that was available to the officers did meet that bar given the information they had about this specific residence. They said that they understood—they both responded to calls about both violent crimes and narcotic sales in this area. The residence was about a block away from a plaza that was well-known for narcotic sales. And then there was evidence that this specific house had been involved in narcotic sales. So when someone then is carrying a firearm in that context and they had gone into the house, of course, as Judge Kidd mentioned, they didn't see any hand-to-hand transactions. But I think an analogy to this Court's decision in Powell is helpful there. In Powell, an individual went to a known drug dealer's house, left and came back, and left a backpack at the house. And this Court said that was enough for reasonable suspicion even though the officers hadn't witnessed any hand-to-hand transactions or any behavior that was indicative of drug sales. But because the individual had gone to this house and left something there, that was enough for reasonable suspicion. And so I think here the analogy is that he was spending time at this house and had gone inside. But the issue is that, at least the way I read the evidentiary hearing, is that the testimony that was given was that the officers specifically testified that the only reason they stopped him was because they saw, you know, the outline or they saw the weapon sort of coming out of his pants. And that was it. I mean, that was the only basis really for stopping. I think because the standard is an objective one, the officers' subjective intentions are irrelevant when this Court is looking at whether there was reasonable suspicion under the totality of the circumstances. So they also testified about the broader contextual factors, about narcotic sales, about the area, about the specific house. And then they said, you know, with all of that information in the background, they said they stopped him because he had a gun. But even if an officer, you know, only stops someone because they had a gun, that doesn't prevent this Court from looking at the totality of the circumstances under the objective standard and determining if the facts were sufficient for the stop. So, I mean, truly on your theory, this is back to Judge Kidd's question, I think really any guy, anybody who gets a haircut on the front porch of this house and then walks inside, presumably perhaps to pay for the haircut, is going to get or could get stopped. I think if there is facts the way we have here, where there was a recent homicide and recent report of narcotic sales at that residence that's in a high-crime area and someone possesses a firearm, I think, yes, I think that just shows the low bar for reasonable suspicion. And so certainly I think you need more than just someone walking down the street in a high-crime area. And I think to differentiate the facts for both Carter and Shepard, the other recent Florida Intermediate Appellate Court cases, there the individual was just generally in a high-crime area walking down the street. In Carter, there was a reference to the fact that the officers were conducting surveillance in the neighborhood, but the individual was just generally at an apartment building. Here they were conducting surveillance on the specific residence that Mr. Joseph was spending time at. So I think that differentiates just the concern about any individual who's in a high-crime area possessing a firearm. I just want to confirm, so your argument really rests, so if he had gone in, gotten his hair cut, and went inside to pay and left, but they didn't see the outline of the weapon or the weapon sticking out of his pants, would they have stopped him? No, I don't think so. If he was just generally present in the high-crime area and had spent time at the house, no, I don't think that would have generated reasonable suspicion. But when you have the connection of the narcotic sales and firearm possession and they visually confirmed that he was possessing a firearm in that context, that's what made it cross the line into reasonable suspicion. The reason I am suspicious of a reasonable suspicion argument, it's the same reason that I'll confess. I'm often suspicious of arguments made by the other side in criminal appeals about cumulative error where it's like, yeah, this is a nothing, that's a nothing, that's a nothing, that's a nothing, but if you total up all those nothings, there's a something that just doesn't make a ton of logical sense in my mind. Here, likewise, we know that possession of the firearm is a nothing for reasonable suspicion purposes. We know that that does not give rise to reasonable suspicion. We know that being in a high-crime area, Wardlow, does not give rise to reasonable suspicion. We know that there were no hand-to-hand transactions, no in-and-out-in-30-seconds, the sorts of things that the officers testified they'd been looking for, so that's not reasonable suspicion. And so what you're really saying is like all of these things that themselves don't give rise to reasonable suspicion, when you kind of bundle them up in a certain way, they do give rise to reasonable suspicion. But I think that's what the Supreme Court has said. So I would dispute the characterization that the firearm is a nothing. The firearm alone is not sufficient, but that doesn't mean that it can't be one of the factors that's looked at. And the Supreme Court has said even if officers observe conduct that may be entirely innocent, but there's several different factors that together, and even, you know, Wardlow, they didn't say that high-crime area alone, they said high-crime area alone is not sufficient, but they did say that the location is relevant. And so that's why here we're saying even if one factor, this factor, that factor, are not sufficient on their own, you are allowed to bundle them up when you're looking at the totality of the circumstances. And, you know, even just— It seems like you're trying to tie, as you say, there are cases dealing with firearms and narcotics. You're trying to tie the firearm to narcotics. But here, there's no evidence that he was engaged in any sort of narcotic sales. Unlike the other case that you referenced, he didn't— there's no evidence he left something behind that the officers could say, oh, maybe those are drugs in a backpack. There's really nothing. So I don't really buy the connection that you're trying to make between the firearm and narcotics, given the record in this case. How do you make that connection? I think it's just the officer's testimony that they understood that firearms are often used in connection with narcotic sales and that they understood that this house was potentially connected to narcotic sales. I think that—certainly I'm not saying that alone they had enough that he was engaged in narcotic sales from the actual—just his conduct. But once you added in the firearm, the officers were able to make the reasonable inference that perhaps he's carrying a firearm because he's involved in it. But I guess the problem is that you still have to grapple with the fact that under state law, he has the ability, unless you prove otherwise, to possess this weapon if he has. So when they stopped him—I mean, I think they could have probably stopped him, I'm just speaking for myself, and asked him, do you have a permit for that concealed weapon? But they didn't do that, correct? Correct. And we would agree they could have, under Florida's law, they could have engaged in a consensual encounter. I think here the officers said that they were concerned about both officer safety and safety of the community because he was walking down the street in an area with a lot of pedestrians. There was a nearby school. Again, under Florida law, that's going to be the case for everybody. I mean, that's why, obviously, if it's a school or if it's an airport, I mean, there's certain carve-outs under the Florida law. But as Florida law currently exists, you just can't stop somebody and take away their weapon without asking them if they have a permit for that weapon. I think if you have nothing else to go off of, that's right. But I think a firearm possession can still contribute to reasonable suspicion. Under Florida Statute 790.06 that was in effect at the time, which was the licensing regime, there were several requirements for someone to have a license. They had to, for example, have taken a firearm safety course. And here Mr. Joseph was carrying the firearm, you know, stuck in the pocket of his hoodie. So those types of things that officers are able to observe and think, you know, the way that the person's handling the firearm, maybe I don't think they are licensed. So I'm not saying that there's testimony here specifically that they suspected that. But in terms of talking about the Florida regime generally, officers need to be able to make those judgment calls if the way that someone is handling a firearm seems like it is irresponsible, it is not in line with the licensure requirements, or it is in circumstances that otherwise are suspicious that would suggest they potentially did not have a license. In my last few minutes, I'd like to briefly address Judge Newsom's question about whether it is at all significant if the stop later morphed into an arrest. And I think the answer is no. I think the question here, and I think Mr. Joseph's opening brief focused on that and argued that it was an arrest at its inception. And then on reply, kind of changed the argument a bit to say that it morphed into an arrest. And I think really what matters here, because the evidence that Mr. Joseph is trying to suppress is the firearm, the analytical lens needs to be on if the officer's conduct was lawful at the time of the initial stop and if they had reasonable suspicion at that point. Even if the stop later morphed into an arrest, the reason that we normally need to demarcate that line is to look at what evidence potentially needs to be suppressed because it was obtained after that point. So here, assuming for the sake of argument, if it had morphed into an arrest without probable cause and then that there were statements or evidence that was uncovered afterwards, that's where the exclusionary rule would come in. But there needs to be a causal connection between the officer's potentially unlawful conduct and the evidence that was obtained. And here, even if something that we maintain that the stop was a Terry stop until they had probable cause, but even assuming it had morphed into an arrest, that would not result in the suppression of the firearm that was obtained at the initial outset of the Terry stop. So really the question is just if the stop was supported by reasonable suspicion at the time that the officers initiated it. If there are no further questions, the government would ask this court to affirm Joseph's conviction. Okay, very well. Thank you so much. Ms. Bedrani, you have five minutes remaining. Thank you, Your Honor. I just want to briefly address just a few points. The government references the high-crime neighborhood, the fact that this house, what I think they said was the spot of known drug sales. We don't actually know that either. The record in this case says that the police, when they were choosing where to surveil, they used this database, they sort by the database's narcotics code, and then it just sorts for them places where police have responded to a particular location. But beyond that, we know nothing about what they responded to at this particular location, and we actually don't even know when. I think the officer who testified said he sets his parameters to within a year, and he picked a home near the top of the list. And so on top of lack of specificity about what actually happened at this house, we actually don't even know when. The homicide that was being investigated was ten days to two weeks prior. There was some back and forth about whether it was a drive-by shooting in the record, so we actually don't know anything about that either. I think the basic point is they also observed Mr. Joseph for 45 minutes, and in that time he was getting a haircut and at some point went into the house and then at another point left the house and just started walking and was on his way. And so with regard to the reasonable suspicion analysis, the government can't ignore factors that might mitigate against reasonable suspicion, so maybe they arrived at this location thinking some thoughts about the home and what they believed was going on there, but when they sat there for 45 minutes, they saw absolutely nothing that was at all out of the ordinary or unlawful in any way. And I think that that is important to remember. With regard to Powell, I think the court already addressed why that's not the greatest analog here, because leaving something in a house that's being surveilled for being a home involved in drug sales maybe contributes to the reasonable suspicion analysis. We don't have anything of the sort here. There's no testimony that he left anything, that he engaged in any sort of drug transactions. And I think just to the broader point, post-Bruin and then post-Florida's amendments to its statute, carrying a firearm is presumptively lawful behavior, and so the very fact that they saw a gun is indicative of nothing unlawful unless they have reason to believe otherwise, and there's just nothing in the record here that would give them any reason to believe that Mr. Joseph was engaged or about to be engaged in any sort of criminal conduct. And so with that, I just would close that it just can't be the case that law enforcement officers can go into specific neighborhoods and forcibly disarm people exercising their Second Amendment right to bear arms. That would just be offensive to the Second Amendment, the Fourth Amendment, and the express decision of the Florida legislature here. So if there are no further questions, we'd ask that you reverse the denial of the motion to suppress. Okay, very well. Thank you both. That case is submitted. We'll move to the third and final case.